**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 14 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

KATHY LEFLER, RAY JUDD,
MICHAEL TUFT, MATTHEW
SWAINSTON and the class of
similarly situated persons,

Plaintiffs/Appellants,

v.

UNITED HEALTHCARE OF UTAH,
INC., a Utah corporation, formerly
known as Physicians Health Plan of
Utah,,

Defendant/Appellee.

No. 01-4228
(Utah)
(D. C. No. 2:95-CV-1109-S)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, Chief Circuit Judge, **HARTZ** and **O'BRIEN**, Circuit Judges.

In 1995, Ms. Kathy Lefler and other plaintiffs (Class) brought this class

action against United HealthCare of Utah, Inc. (United), a health maintenance

organization, under the Employee Retirement Income Security Act of 1974

---

[*]  This order and judgment is not binding precedent except under the
doctrines of law of the case, *res judicata* and collateral estoppel.  The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

(ERISA)[2], seeking to recover benefits due under an employee welfare benefit plan, 29 U.S.C. §1132(a)(1)(B)[3], and for other equitable relief, 29 U.S.C. §1132(a)(3). The Class challenged United's method of calculating co-payments, which it alleged violated the terms of the plan because it effectively increased their percentage contribution to the actual cost of covered services. Concluding United's practice resulted from a reasonable interpretation of the benefit plan, the district court granted summary judgment to United and denied summary judgment for the Class. Exercising jurisdiction under 28 U.S.C. §1291 (2002), we affirm.

***Factual Background***

United is licensed in Utah, but owned by parent United HealthCare Services, Inc., located in Minnesota. During the class period, 1992 to 1995, United provided health insurance to approximately 100,000 people in Utah through employer-sponsored health insurance plans governed by ERISA. In most instances, employees contributed to the premiums. United was a fiduciary[4] under

---

[2]29 U.S.C. §§1001 through 1461 (1995).

[3]The Class consists of employees and dependents with average claims between $100.00 and $200.00. The Class abandoned its claims for declaratory and injunctive relief since United changed its challenged practice in 1995. This lawsuit is thus limited to what minimal individual refunds might be available to members of the Class. Of course, attorneys fees and costs are also at stake.

[4]"[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary

the plans. Policy terms were stated in a Certificate of Coverage, which along with its Schedule of Benefits constituted the plan documents for an employer unit. The Schedule of Benefits varied according to the coverage elected by a particular unit, but provided for beneficiary co-payments stated as a percentage of eligible expenses, usually ten or twenty percent.

The participants were required to obtain health services from "participating providers" with whom United had negotiated contracts. Among other things, those providers charged United discounted rates. United calculated participant co-payments based upon full billed charges but paid providers against the discounted rates.[5] That is the source of the Class' dissatisfaction. As a consequence of United's practice, the Class members claim to have unknowingly and inappropriately paid a greater percentage of the actual cost of the service than the co-payment percentage stated in their Schedule of Benefits.

In none of the plan documents did United promise to pay the difference

---

authority or discretionary responsibility in the administration of such plan." 29 U.S.C. §1002(21)(A).

[5]For example, if a health service was billed at $1,000.00 and the plan required a twenty percent co-payment, a participant would pay $200.00 directly to the provider. And, if United had arranged a discounted fee of $800.00 for the service, it would pay only $600.00. As a result, the participant's actual share would be twenty-five percent, not twenty percent.

between the co-payment and the amount billed, or any other specified amount.[6]

United did not disclose in the plan documents or in any Explanation of Benefits provided to the Class members that it had negotiated a discount from participating providers' regular, full billed charges. Nor did it reveal the amount it paid to participating providers (the difference between the co-payment and the discounted rate). The Certificate of Coverage only described a participating provider as one with whom United had entered into "a written agreement . . . to provide health services to covered persons." (R. at 246).

During the Class period, Utah Code Ann. §31A-26-301.5(2)(c) provided: "[T]he insurer shall notify the insured of payment and the amount of payment made to the provider."[7] On its Explanation of Benefits, United only indicated the amount it paid to a provider was a "contracted fee." (R. at 486-87). But occasionally a bill from a participating provider to a participant would clearly state the amount paid by United, and the co-payment methodology employed. There were common instances where a co-payment was the only amount paid for the service because of United's negotiated discounted fee with the provider.

Borrowing established Medicare practice, United routinely considered the

---

[6]This plan contrasts with conventional indemnity insurance in which the insurer agrees to pay all covered charges exceeding the participant's co-payment.

[7]Legislative history establishes the purpose of this language was to pass through to an insured discount rates negotiated between a health service provider and a payor-insurer.

full billed charges submitted by participating providers to be "reasonable and customary charges" under the plan.  In support of this practice, it filed an affidavit from Dr. William Cleverly, an expert in the health care industry.  According to Dr. Cleverly, hospitals submit a standard charge for services to insurers and other payors on a form used industry-wide and generated by the federal Health Care Financing Administration (HCFA), which administers the Medicare program.  But those standard charges are typically discounted in accordance with individual contracts negotiated between payors and service providers.  Under Medicare, for example, the patient's percentage co-payment is calculated against the full billed charge, even though Medicare pays the hospital a reduced fee set by government regulation and tied to a provider's reasonable cost.

United also submitted the affidavit of Terry Cameron, a consultant for health care providers, who stated individual physicians also submit standard charges on a widely used HCFA form.  Like hospital fees, these charges are based on a uniform schedule even though the amounts the physicians actually receive often vary according to the payor.  According to Mr. Cameron, the standard charges are fed into databanks maintained by the Health Insurance Association of America (HIAA) and others, and used to compile information on reasonable and customary charges around the country.  Significantly, in her deposition, Class expert Mary Covington, an insurance claims auditor, pointed out that United

considers any charge at or below the eighty to eighty-fifth percentile of the HIAA schedules to be "reasonable and customary." Charges above the eighty to eighty-fifth percentile were considered ineligible.

United's evidence revealed that co-payment methods were routinely explained to units enrolled in the plan and to the Class members, usually when employers were comparing different insurance plans in the market or during enrollment meetings with employees.[8] The declared advantage of this practice was lower premiums since United's premiums were experience-rated, that is, directly tied to actual expenditures for health care service.[9] The named Class members denied knowledge of this practice. But, in affidavits submitted by United, two participants who were not named members of the Class stated they were aware of United's co-payment methodology. Each considered United's practice an advantage since it lowered premium rates and slowed rate increases. The Minnesota Department of Health, an agency with jurisdiction over United's parent company, had approved an identical co-payment methodology. Prior to 1992, the Department's rules limited co-payments to twenty-five percent of the provider's "costs or charges." To dispel confusion between "cost" and "charge,"

___

[8]Affidavits of independent insurance agents Donald Sparks.

[9]Mr. Sparks's market research showed that if United was to calculate co-payment percentages against a discounted fee it would result in an increase of one percent in cost of premiums for an employer.

a 1992 amendment to the rules deleted the word "cost" and explicitly limited the co-payment to twenty-five percent of the "provider's charge," defined as "the fees charged by the provider which do not exceed the fees that provider would charge any other person . . . ." Minn. R. 4685.0801 (1999).[10] However, there was no evidence any other insurer in Utah calculated co-payment percentages as United did during the class period.

### District Court Decision Under Review

In addition to its claims under 29 U.S.C. §1132(a)(1)(B),[11] the Class alleged United breached its fiduciary responsibility. It sought, under 29 U.S.C. §1132(a)(3),[12] to impose a constructive trust for monies it contends were improperly held as a result of United's co-payment methodology.

---

[10]In spite of protests from organizations taking a position identical to that of the Class in this case, an administrative law judge recommending adoption of the amendment wrote, "[t]he proposed rules are intended to clarify that the provider's charge is a proper basis for calculating the co-payment." Minn. Office of Administrative Hearings, Report of Administrative Law Judge, 11-0900-6030-1, p.5 (1992), 1992 WL 811246, p.4.

[11]"A civil action may be brought – (1) by a participant or beneficiary . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. §1132(a)(1)(B).

[12]"A civil action may be brought – (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan. 29 U.S.C. §1132(a)(3).

With respect to the §1132(a)(1)(B) claim, the district court found both the Class's interpretation of the plan language (co-payment percentages should be applied against a provider's discounted rate) and United's interpretation of the same language (co-payment percentages should be applied against the full billed charge) to be reasonable. Because the policy language was susceptible to two reasonable interpretations, the district court concluded it was ambiguous. However, since United enjoyed the prerogative to construe policy terms and conditions, and since its construction was not arbitrary or capricious, the district court granted summary judgment to United. Since the Class presented an arguable § 1132(a)(1)(B) claim, the district court, relying on *Varity Corp. v. Howe,* 516 U.S. 489 (1996), concluded its § 1132(a)(3) claims were foreclosed and dismissed them.

### *Standard of Review*

We review de novo the district court's grant of summary judgment under Fed. R. Civ. P. 56(c), viewing the evidence and reasonable inferences to be drawn from it in the light most favorable to the nonmoving party. *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1326 (10th Cir. 1999), *cert. denied* 528 U.S. 815 (1999). However, there is a nuance to the standard of review as it applies to a §1132(a)(1)(B) claim. It concerns United's exclusive right, under its Certificate of Coverage, to construe the terms and

conditions of the plan. The Supreme Court has held "a denial of benefits challenged under §1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). In such an instance, the exercise of fiduciary discretion is reviewed under an arbitrary and capricious standard. *Chambers v. Family Health Plan Corp.,* 100 F.3d 818, 825 (10th Cir. 1996). But, if the fiduciary has a conflict of interest,[13] a court applying the standard "must decrease the level of deference given to the conflicted [fiduciary's] decision in proportion to the seriousness of the conflict." *Id.; see also Firestone,* 489 U.S. at 115. The conflict is weighed as a factor in determining the level of deference, which "will be decreased on a sliding scale in proportion to the extent of conflict present, recognizing the arbitrary and capricious standard is inherently flexible." *McGraw v. Prudential Ins. Co. of America,* 137 F.3d 1253, 1258 (10th Cir. 1998). If the conflict of interest is so strong as to eliminate any deference, we will independently construe the plan according to ordinary rules of contract interpretation. Otherwise, we will uphold the fiduciary's interpretation if it is reasonable.

---

[13]"[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . ." 29 U.S.C. §1104(a)(1).

Like the district court, we conclude United is a conflicted fiduciary. "[W]hen an insurance company serves as ERISA fiduciary to a plan composed solely of a policy or contract issued by that company, it is exercising discretion over a situation for which it incurs direct, immediate expense as a result of benefit determinations favorable to plan participants." *Pitman v. Blue Cross & Blue Shield of Okla.,* 217 F.3d 1291, 1296 (10th Cir. 2000) (quotation marks and citation omitted). As well, savings United realized from its challenged practice contributed to the vitality of its business and its competitive position in the insurance industry.[14] *Id.*

While we recognize United's conflict of interest, it is not so strong as to eliminate deference to its interpretation of the plan if that interpretation is otherwise reasonable. Its challenged practice, being systemic and not arbitrarily or capriciously applied to individual plan participants or beneficiaries, diminishes the level of its conflict. To be sure, the plan design purposefully results in cost

---

[14]United argues any savings it realized in its co-payment methodology were passed on to its enrolled units in the form of lower premiums, since premiums were experience-rated. While this may have benefitted plan participants and beneficiaries when employees contributed to premiums, they did not always do so. Nevertheless, United argues premium savings realized by enrolled units positively affected all plan participants and beneficiaries by enabling the enrolled unit to maintain broad coverage and/or forestall rate increases. In this way, United argues, lower premiums contributed to the overall health of the employer unit, indirectly benefitting employees. While plausible, these arguments do not diminish the market advantage enjoyed by United as a result of its co-payment methodology.

shifting to the Class members who access health services by requiring them to pay a greater portion of the actual cost of those services. But plan design is immune from judicial review. *Jones v. Kodak Med. Assistance Plan,* 169 F.3d 1287, 1292 (10th Cir. 1999). As we consider the reasonableness of United's interpretation of the plan, we are reminded a fiduciary's interpretive decision

> need not be the only logical one nor even the best one.
> It need only be sufficiently supported by facts within
> [its] knowledge to counter a claim that it was arbitrary
> or capricious. The decision will be upheld unless it is
> not grounded on *any* reasonable basis. The reviewing
> court need only assure that the [fiduciary's] decision
> fall [s] somewhere on a continuum of
> reasonableness–even if on the low end.

*Kimber v. Thiokol Corp.,* 196 F.3d 1092, 1098 (10th Cir. 1999) (quotation marks and citations omitted) (emphasis in the original). Significantly, it is of no moment that the Class's interpretation of the Certificate language is also reasonable. We test only to determine if United's interpretation is reasonable. As stated in *Kimber*, "[d]eferential review does not involve a construction of the terms of the plan; it involves a more abstract inquiry–the construction of someone else's construction." *Id.* at 1100 (quoting *Morton v. Smith*, 91 F.3d 867, 871 n.1 (7th Cir. 1996) (citations omitted)).

*Discussion*

*§1132(a)(1)(B) Claim*

With these principles in mind, we consider the reasonableness of United's interpretation of the ambiguous language.[15] Applying the appropriate standard of review, the district court concluded United's interpretation was reasonable and sustained by its evidence. We agree.

The Class first argues since co-payment is against eligible expense only there must perforce be some portion of an expense which United considered ineligible. While it is thus far correct, it further asserts the ineligible portion of a claim is the spread between the full billed charge and the discounted fee with the provider, especially since the provider is prohibited by agreement with United and by Utah statute from collecting this amount from the class member. As a result, claims the Class, the eligible expense against which the co-payment should be applied is the discounted fee. This argument is strained.

A straightforward approach to determining "eligible expense" is more reasonable. "Eligible expenses" under the policy are defined as "reasonable and

_____

[15]To the district court, the Class argued the terms of the plan were ambiguous. On appeal, it continues that argument but adds an alternative. It now claims the plan terms are not ambiguous and should be read in its favor. Even if the alternative argument has merit, we decline to consider it since it is a theory not presented to the district court. *Tele-Communications, Inc. v. Commissioner of Internal Revenue,* 104 F.3d 1229, 1233 (10th Cir. 1997).

customary charges[16] for health services." (R. at 244). Since covered "health services"[17] include only those deemed "medically necessary,"[18] when presented with a claim United must apply a two-step test for eligibility. First, is the service "medically necessary?" If not, the service charge is an ineligible expense. Second, is the charge presented for the service "reasonable and customary?" If not, it is ineligible. Reasonable and customary charges for medically necessary services are thus eligible expenses and in turn determine the co-payment.

The Class next takes issue with United's interpretation of "reasonable and customary charges" under the plan. It argues the Certificate language referring to reasonable and customary charges "incurred," means those costs incurred by United, and since the cost incurred by United is based on the discounted fee it is this sum against which a class member's co-payment percentage ought to be

---

[16]"'Reasonable and Customary Charges' - fees for Covered Health Services and supplies which, in PLAN's judgment, are representative of the average and prevailing charge for the same Health Service in the same or similar geographic communities where the Health Services are rendered and which *do not exceed* the fees that the provider would charge any other payor for the same services." (R. at 247) (emphasis added).

[17]"'Health Services' - the health care services and supplies Covered under the Policy, except to the extent that such health care services and supplies are limited or excluded under the Policy." (R. at 245).

[18]"'Medically Necessary' - those Health Services which are determined by PLAN to be necessary to meet the basic health needs of an individual. Determination of Medical Necessity is done on a case-by-case basis and considers several factors including, but not limited to, the standards of the medical community." (*Id.*)

applied. This is, again, a strained reading of the Certificate. "Co-payment" is defined as the class member's responsibility for "health services provided." (R. at 243). Health services are provided to the Class members, not United. Therefore the charge for the service is incurred by the Class member, not United.

The Class also claims United's interpretation of the phrase "reasonable and customary charges" is unreasonable because United exercised no "judgment," as the Certificate required, as to whether the full billed charge was "representative of the average and prevailing charge for the same health service in the same or similar geographic communities where the health services are rendered and which do not exceed the fees that the provider would charge any other payor for the same services." (R. at 247). According to the Class, United's only exercise of judgment was in negotiating the discount rate, and thus the discount rate constitutes the "reasonable and customary charge." However, the evidence from the Class's own witness, Mary Covington, is contrary. United routinely considered any charge at or below the eighty to eighty-fifth percentile of the HIAA schedules to be "reasonable and customary." That is a rational exercise of judgment and not unreasonable since the practice mirrored Medicare methodology and was explicitly approved by the Minnesota Department of Health.

Lastly in that vein, the Class argues the full billed charge is not a "reasonable and customary charge" because it exceeds "the fees that the provider

would charge any other payor for the same services." As an example of such a lower fee, the Class again points to the discount rate which United negotiated with its participating providers. This argument breaks down if in fairness we undertake to compare discount rates other payors might have negotiated with the same providers, to see if those rates are lower than United's rates. The Class's suggested interpretation of "reasonable and customary charge" demands this comparison. As the district court ably pointed out, it is impossible to compare other payor-provider negotiated rates because of the proprietary and confidential nature of such competitor agreements. In the absence of this information, the Class could never be assured United's negotiated rate did not exceed another insurer's negotiated rate. Since the Class's interpretation of the Certificate, offered to rebut the reasonableness of United's interpretation, would result in impossibility of contract performance due to the inability to compare other negotiated rates, the district court rightly favored United's position.

Moving to a new but related topic, the Class claims United violated Utah law requiring an insurer to inform a claimant as to the amount it paid the provider. That violation, the Class argues, makes United's co-payment methodology impermissible.[19] This argument was not presented to the district

_____

[19]The Class also argues violation of Utah law renders United's methodology unreasonable. This argument is not persuasive because if United strictly complied with the statute the Class would, at most, have been explicitly put on notice of

court [on the Class's benefit recovery claim under §1132(a)(1)(B)] and we will therefore not consider it on appeal. *Tele-Communications, Inc. v. Commissioner of Internal Revenue,* 104 F.3d 1229, 1233 (10th Cir. 1997). Nor will we consider the related theory, first presented on appeal by the Class in its Reply Brief, that the doctrine of promissory estoppel under Utah law provides remedial relief. *Id.* For the same reason, we will not consider the Class's argument that the policy incorporated ERISA, and therefore fiduciary obligations set out in ERISA are plan terms subject to enforcement under §1132(a)(1)(B). *Id.*

Finally, the Class urges application of the doctrine of *contra proferentem* to construe the ambiguous language of the plan against the drafter, United. The district court declined to do this, either on the basis of state or federal common law, on the grounds of ERISA pre-emption. Were it not for the fact the plan confers sole and exclusive discretion upon United to construe its terms, albeit reasonably and subject to increased scrutiny in the case of a conflict of interest, *contra proferentem* might apply. But the doctrine is plainly inapposite where a reviewing court is determining the reasonableness of the construction of the contract by one of the parties to it instead of construing the language of the contract itself. "[W]hen a plan [fiduciary] has discretion to interpret the plan

United's co-payment methodology, which begs the question presented here: the reasonableness of the methodology itself.

and the standard of review is arbitrary and capricious, the doctrine of contra proferentem is inapplicable." *Kimber,* 196 F.3d at 1100.

We conclude United's interpretation of the Certificate language was a reasonable one. Considering a health service provider's full billed charge to be "reasonable and customary" harmonizes well with Medicare practice, an identical procedure explicitly approved by state regulators in Minnesota, and with the Certificate requirement the charge of the provider cannot exceed charges to any other payor for like services.

### *§1132(a)(3) Claim*

The Class sought equitable relief under 29 U.S.C. §1132(a)(3), claiming United, as a 29 U.S.C. §1002(21)(A) fiduciary, breached its fiduciary duty by failing to inform the class of its discounting practice[20] and improperly denying, de facto, benefits under the plan. The Class also argues the plan, by its terms, incorporated Utah law, specifically Utah Code Ann. §31A-26-301.5, requiring detailed payment notification to an insured. The argument continues – since United only vaguely described its practice, it violated Utah law and, a fortiori, the

---

[20]"A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries . . . . The summary plan description . . . shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. §1022(a).

plan itself.

We agree with the district court that consideration of a claim under 29 U.S.C. 1132(a)(3) is improper when the Class, as here, states a cognizable claim under 29 U.S.C. §1132(a)(1)(B), a provision which provides adequate relief for alleged class injury. "[W]e should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate'." *Varity,* 516 U.S. at 515. Dismissal of the §1132(a)(3) claim was proper as a matter of law.

### *Conclusion*

For the reasons given, we AFFIRM the judgment of the district court.

**Entered by the Court:**

**TERRENCE L. O'BRIEN**
United States Circuit Judge